IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KENZA L. STARLING,                        :
                                          :
              Plaintiff,                  :
                                          :
    v.                                    : Civil Action No. 07-541-JJF
                                          :
POSTMASTER GENERAL JOHN E.                :
POTTER,                                   :
                                          :
              Defendant.                  :

Kenza L. Starling, Bear, Delaware.  Pro se Plaintiff.

Lesley F. Wolf, Esquire, Assistant United States Attorney,
Wilmington, Delaware.  Attorney for Defendant.

## MEMORANDUM OPINION

February $\underline{12}$, 2010
Wilmington, Delaware

Farnan, District Judge

Plaintiff Kenza L. Starling ("Plaintiff") filed her
Complaint on September 10, 2007, alleging employment
discrimination pursuant to Title VII of the Civil Rights Act of
1964, as amended.  (D.I. 2.)  Plaintiff proceeds pro se.  The
Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Presently before the Court is Defendant's Motion For Summary
Judgment and supporting Memorandum, Plaintiff's Response and
Defendant's Reply.  (D.I. 18, 19, 29, 30.)  For the reasons
discussed, the Court will grant Defendant's Motion For Summary
Judgment.  (D.I. 18.)

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who proceeds pro se, filed her Complaint against
Defendant John E. Potter ("Defendant"), Postmaster General of the
United States Postal Service ("USPS"), alleging employment
discrimination she describes as "harassment, disparity treatment,
discrimination, race and retaliation, hostile work environment."
(D.I. 2.)  Exhibits filed contemporaneously with the Complaint
refer to discrimination based upon gender, disability, and union
activity.[1]  (D.I. 3; see also D.I. 22, Plaintiff's deposition.)

---

[1]The exhibits consist of three volumes of paper documents
approximately six inches thick.  (D.I. 3.)  Plaintiff testified
at her deposition that she submitted the documents because she
did not know what she was doing and did not want to miss
anything.  (D.I. 22, A-89.)  Additionally, she thought she was
supposed to provide the actual complaint of everything that had
taken place.  (Id. at A-090.)

2

Plaintiff alleges twenty-three discriminatory acts occurring from May 29, 2004 through April 6, 2005, and specifically in 2004 on May 29; June 2, 3, 4, and 10-26; July 1 and 5; August 5; September 24; and December 23; and in 2005 on January 18, 23-26, and 31; February 7; March 17; and April 6. (D.I. 2, ex. 5.) Plaintiff filed an EEOC Complaint of Discrimination on April 7, 2005, asserting discrimination based upon race, color, sex, retaliation, and disability. (D.I. 2, ex. 3.) She received notice of her right to file a civil action on June 30, 2007. (D.I. 2.) Plaintiff has since withdrawn her gender discrimination claim. (D.I. 22, A-092, A-180; D.I. 29.)

During the relevant time period, Plaintiff, an African-American female, was employed by the USPS as a modified mail processor at the USPS South Jersey Processing and Distribution Center in Bellmawr, New Jersey.[2] (D.I. 22, A-48.) As a result of a 2001 work related injury, Plaintiff's position was modified; that is, reduced according to her limitations. (D.I. 22, A-064, 072.)

Plaintiff testified that she has a partial disability that began in July 2002 due to her elbow and shoulder. (D.I. 22, A-094.) She explained that because of her disability, she is not able to do what she was hired to do. (Id. at A-095.) At work

---

[2]As of the date of her October 3, 2008 deposition, Plaintiff continued her employment with the USPS. (D.I. 22, A-064.)

she is restricted to lifting up to five pounds.  (Id. at A-098.)
Her partial disability, however, does not limit her ability
outside the workplace, she just refrains from performing the
activity.  (Id. at A-095.)  For example, Plaintiff does not ride
motorcycles, bowl, or engage in activities with her children that
she normally would.[3]  (Id. at A-096.)  She is able to dress
herself, eat, bathe, cook, and lift things, but is unable to
throw a ball.  (Id. at A-096-097.)

Plaintiff was off work for an extended time from
approximately November 2004 to January 2005 as a result of
surgery to the ulnar nerve.  (D.I. 22, A-072-074, A-171.)  She
received workers' compensation during this absence.  (Id. at A-
074.)  She was also off work after removal by a supervisor –
five days in January 2005, and from February 2005 until May 2005.
(Id. at A-077-078.)  Plaintiff testified that she was not paid
during these absences, but that she later sought, and received,
workers' compensation benefits retroactive from January through
May 2005 at seventy-five percent of her salary.  (Id. at A-078,
A-149-151, A-164.)

As of 2004, Plaintiff's worked casing mail, sorting letters
by zip codes and placing them into the different sections of a

---

[3]Plaintiff has taken pain medication, such as Ibuprofen, off
and on for the past six years, but nothing stronger.  (D.I. 22,
A-096-097.)  Plaintiff received physical therapy treatment, two
to three times per week, until April 2008.  (Id. at A-097.)

letter case (i.e., box). (D.I. 22, A-079.) Twenty to thirty persons work in her area and there are from two to five supervisors of distribution operations ("SDO"), one to three managers of distribution operations ("MDO") for each shift, and one plant manager. (Id. at A-079, A-081.)

Plaintiff is a union member and became a shop steward for the American Automation Worker Union in either the beginning of 2003 or March of 2004.[4] (D.I. 22, A-083-084.) In this position she is the go-between the employee and management with regard to the contract, manuals, and employee/management agreements. (Id. at A-083.)

Plaintiff submitted a vacation leave request, Form 3971, to her 204B acting supervisor Donna Wdzieczkowski ("Wdzieczkowski"), who is white. (D.I. 22, A-011, A-106, A-153-153.) Plaintiff was on vacation from work from May 22, 2004 through May 27, 2004 and, when she returned to work on May 29, 2004, discovered that she had been designated absent without leave ("AWOL") for the time period.[5] (D.I. 2, ex. A1; D.I. 22, A-099, A-103.) According to Wdzieczkowski, the leave requests were improperly completed – one

---

[4]Plaintiff testified that she became a shop steward in 2003, but the EEOC found that she became a shop steward in around May 2004. (D.I. 22, A-011.)

[5]When an employee receives an AWOL, it is placed in his record, and after a certain number of AWOL's the employee is disciplined. (Id. at A-105.) The discipline can consist of a letter of warning, a five or seven day suspension, or termination. (Id. at A-105.)

5

was undated and one requested leave without pay - and
Wdzieczkowski did not have approval for the request. (D.I. 22,
A-013.) Wdzieczkowski was directed to leave the slips with MDO
Rick Weissman ("Weissmann"), who is white. (Id.) On the day she
returned to work, Plaintiff spoke to MDO Vicky Rego ("Rego") who
was unaware of the situation. (Id.) Rego spoke to Wdzieczkowski
and ultimately corrected the problem and approved the leave.
(Id. at A-013, A-104, A-109.)

On June 2, 2004, Plaintiff spoke to Wdzieczkowski because
she was the person to whom Plaintiff had given her annual leave
slips. (D.I. 22, A-106.) That meeting led to a confrontation
which resulted in another meeting among Plaintiff, Wdzieczkowski,
and Weissman. (Id. at A-107.) Plaintiff's position as a shop
steward, her disability, and her race were not mentioned during
the meeting. (Id. at A-108.) That evening, while on break,
Plaintiff was paged by Wdzieczkowski. (Id. at A-122.)
Wdzieczkowski later placed Plaintiff AWOL status from 9:55 PM to
11:10 PM because she was away from her area. (D.I. 2, ex. A1;
D.I. 22, A-014, A-112.) There is discrepant evidence whether
Plaintiff was away from her area for that length of time. (D.I.
22, A-014-015.) According to Plaintiff, the events ultimately
led to a day in court and discipline.[6] (Id. at A-108.)

---

[6]Employees are issued a notice for a "Day-In-Court" which is
typically a pre-disciplinary interview or hearing.

6

Plaintiff testified that she was ambushed and unaware she would appear in court until the next day, June 3, 2004, when she arrived at work and was told to go to the office. (D.I. 22, A-109-110.) She was represented by shop steward Bob Peques ("Peques"). (Id.) Others present included Dean Harris ("Harris"), Weissman, and Rego. (Id. at A-110.) Plaintiff testified that her union activity was discussed at the hearing, specifically that she needed to code her work to reflect when she was performing union work. (Id. at A-111.) Her disability, modified work assignment, and race were not discussed. (Id.)

The evening of June 4, 2005, Plaintiff was questioned by Wdzieczkowski who asked for her time card but Plaintiff refused to give it to her. (Id. at A-016.) Two witnesses who observed the exchange between Plaintiff and Wdzieczkowski stated there was tension between the two and described Plaintiff as obnoxious, loud, and belligerent towards Wdzieczkowski. (Id. at A-016-017.)

The next day, when Plaintiff arrived at work her time card was not in the time card rack and she went to the tour secretary's office to retrieve it. (D.I. 22, A-113, A-119.) Plaintiff testified that if the time card is not in the rack, then the supervisor is supposed to know where it is. (Id. at A-119.) Plaintiff believed that her direct supervisor, SDO Valerie Michaelis ("Michaelis"), who is white and who was in the office, made inappropriate, unnecessary, and unprofessional comments

7

about the location of Plaintiff's time card. (Id. at A-113, A-152-153.) On the same day Plaintiff spoke to Sue McGovern ("McGovern"), who is white, about the incident. (Id. at A-114.) McGovern came onto the floor to aid Plaintiff in finding her time card. (Id.) Wdzieczkowski denied seeing Plaintiff's time card after being questioned by McGovern. (Id.) Wdzieczkowski told Plaintiff that as a shop steward she should know better, but she did not mention Plaintiff's disability or race. (Id. at A-113.)

Plaintiff's time card was ultimately found in another person's slot. (D.I. 22, A-114) She testified that her time card had never before been misplaced. (Id. at A-121.) According to Plaintiff, even though they are not supposed to, approximately sixty-five percent of the employees carry their time cards in their pockets. (Id. at A-155.) Statistical data indicates that white employees are not allowed to keep their time cards in their possession without permission of their supervisor. (Id. at A-239.) Plaintiff believed that a game was being played with her time card because her card went missing when Michaelis or Wdzieczkowski were present but, when they were not present, her card was exactly where she had left it the previous night. (Id. at A-156.) On two other occasions - June 25 and June 26, 2004 - when Plaintiff arrived at work, her time card was not in the slot. Plaintiff did not suffer any consequences or lose any pay as a result of the time card incident. (Id. at A-112.)

8

Plaintiff appeared in court a second time on June 10, 2004 due to issues related to the June 2 and June 3 AWOL issue. (D.I. 22, A-115.) There was no mention of Plaintiff's union work, disability, or race during the hearing. (Id. at A-116.) SDO/MDO John Lumpkin ("Lumpkin") was present and Peques may have been present as Plaintiff's representative. (Id. at A-115.) On June 15, 2004, Plaintiff was issued a seven day suspension by Michaelis, with the concurrence of Weissman, for being out of her work area and for violating rules regarding behavior and personal habits with regard to the time card incident.[7] (Id. at A-017, A-115.) The suspension was without pay. (Id.) Plaintiff testified that the suspension was a result of "what happened between [her] and [Wdzieczkowski]." (Id. at A-119.) Plaintiff filed a grievance, the suspension issue was settled, and Plaintiff did not serve the suspension or lose any time. (Id. at A-018, A-120.)

On July 1, 2004, Michaelis presented Plaintiff with paperwork, signed by Weissman, requiring her to update her medical restrictions with a July 14, 2004 submission deadline. (D.I. 22, A-018.) Plaintiff testified that she receives requests on an annual basis to provide medical information. (Id. at A-121.) According to Plaintiff, when she received the request as many as twenty-five individuals, including four white modified

---

[7]Michaelis has also disciplined a white male charged as AWOL with a seven day suspension. (D.I. 22, A-240-241.)

mail processors, a black female, and a shop steward, did not
receive such a request. (Id. at A-120-122, A-157.) Statistical
data indicates that black and white employees are required to
update their medical information. (Id. at A-246.)

Plaintiff testified that she arrived to work early on July
5, 2004, a holiday, but was told she could not start early
because she failed to make a request ahead of time. (D.I. 22, A-
124.) Plaintiff testified that other employees were allowed to
work early, but she was the only one singled out. (Id.) Another
limited duty employee, who was black, was allowed to start early
even though she had not made an early request. (Id.)
Statistical evidence indicates that white, Filipino, and black
females who had permission, were allowed to work early on July 5,
2004. (Id. at A-241.) Plaintiff testified that although she did
not suffer any loss of pay, from that day forward, like all other
limited duty employees, she could no longer sign up to work
holidays. (Id. at A-123.)

In the summer, Plaintiff typically wears sandals to work
and then changes into sneakers before starting work. (D.I. 22,
A-125.) On August 4, 2004, Plaintiff was approached by Michaelis
who reiterated over and over that Plaintiff could not wear
sandals. (Id.) Plaintiff testified that Michaelis did not say
anything to two other employees, both union members but not shop
stewards, who also wear sandals to work. (Id. at A-126.) One

10

employee is black and the other is white. (Id. at A-127.)
Michaelis denied seeing other employees, either white or black,
wearing improper shoes on August 5, 2004, but a witness indicated
that Michaelis had admonished a white employee not to wear
sandals to work. (Id. at A-020, A-242.) Michaelis did not
mention Plaintiff's union activities, work limitations, or race.
(Id. at A-127.) Plaintiff did not suffer any loss of pay or
discipline her, but was told to put on her shoes prior to
arriving at the workroom floor. (Id. at A-019, A-126.)

Plaintiff testified that she has medical documentation for a
particular type of chair. (D.I. 22, A-128.) On September 24,
2004, Plaintiff was away from her desk and returned to find that
Michaelis had removed the chair from Plaintiff's work station,
given the chair to another employee, and required Plaintiff to
provide medical documentation for the chair. (D.I. 2, ex. A1;
D.I. 22, A-128-129.) Plaintiff provides documentation for the
chair annually, when an update is required. (D.I. 22, A-129.)
She believes that she last provided an update in November 2003,
but, according to Michaelis, she did not have the documentation.
(Id. at A-020, A-129-30.) After her chair was taken, Plaintiff
was sent to the swing room (i.e., break room) because she had no
chair, but she did not lose any pay. (Id. at A-130.) The next
day Plaintiff provided the documentation and retrieved her chair.
(Id. at A-131.) Statistical evidence indicates that white,

11

black, and Filipino individuals are required to provide medical
documentation for special chairs.  (Id. at A-243-244.)

Plaintiff underwent elbow surgery in November 2004 and was
off work from November 22, 2004 to January 8, 2005 following the
surgery.  (D.I. 22, A-020, A-132.)  She received workers'
compensation during that time.  (Id. at A-132.)  Upon her return
to work on January 8, 2005, Plaintiff submitted a Duty Status
Report CA 17 form ("CA 17 form").  (Id. at A-134, A-219.)
Employees returning from medical leave are required to submit a
CA 17 form, completed by their physician.  (Id. at A-133.)  The
form determines the employee's work limitations.  (Id.)  The form
is submitted on the day of, or before, the employee returns to
work.  (Id. at A-134.)  Plaintiff resumed working as she had
prior to the surgery.  (Id.)

On January 18, 2005, Plaintiff was advised by Michaelis that
the previously submitted CA 17 form was incomplete and
unacceptable.  (D.I. 2, ex. A1; D.I. 22, A-135, A-263.)
Plaintiff was give seven days from the date of the letter to
provide an acceptable updated form and instructed to remain in
the employee's swing room during her hours of employment.  (D.I.
22,  A-021, A-263.)  When she placed Plaintiff in the swing room,
Michaelis did not mention Plaintiff's union work or race, but
told her the CA 17 was unacceptable.  (Id. at A-136.)  Around
January 22, 2005, Plaintiff submitted a note that indicated her

12

next doctor's appointment was February 22, 2005. (<u>Id.</u> at A-021, A-264.)

On January 23, 2005, management advised Plaintiff that a new start time did not apply to her after she reported for work at the new start time in accordance with a December 23, 2004 notice that Plaintiff had signed and accepted on December 28, 2004. (D.I. 2, ex. A1.) The notice provided a report date and indicated that her hours were being changed. (D.I. 22, A-138.) According to Plaintiff, the hours were better, but the pay was less. (<u>Id.</u> at A-138, A-141.) When Plaintiff reported, Wdzieczkowski told her that the notice did not apply to limited duty employees. (<u>Id.</u> at A-138.) Plaintiff requested a temporary change of schedule until the matter was resolved, but her request was denied due to operational needs by MDO Joseph Vannera ("Vannera"), who is white. (<u>Id.</u> at A-138, A-140, A-152-153.) No mention was made of Plaintiff's race, disability, or union work in denying the request. (<u>Id.</u> at A-140-141.) Plaintiff noted that in the past her requests for a temporary change of schedule were approved (<u>Id.</u> at A-139.) She is unaware of any limited duty employees who received the notice and whose schedule was changed; other employees received the notice but they were not limited duty employees. (<u>Id.</u>) However, she testified that four individuals, all white, and all limited duty employees, were treated differently than her with regard to the change of

schedule issue. (<u>Id.</u> at A-154.) None of them served as shop stewards. (<u>Id.</u> at A-155.)

On January 26, 2005, Michaelis sent Plaintiff home and told her not to return until her medical was updated.[8] (D.I. 22, A-022, A-142-143.) Michaelis did not mention Plaintiff's race, disability, or union activity. (<u>Id.</u>) A few days later it was determined by management that Plaintiff could work with restrictions, and noted the eastern area policy to accommodate all restrictions. (<u>Id.</u> at A-023.) Plaintiff was offered a limited duty job offer in February via mail, but it did not comply with her limitations and, according to Plaintiff, she rejected the offer. (<u>Id.</u> at A-024, A-143-144; A-257.) According to the EEOC, Plaintiff moved and she never received the letter. (<u>Id.</u> at A-024.)

Between January 26 through February 7, 2005, Plaintiff was either on leave without pay or AWOL. (D.I. 22, A-144.) She did not hear from the USPS between February 7 and March 17, 2005, and was not paid during that time. (<u>Id.</u> at A-145.) Plaintiff believes that she was considered AWOL during this time, but is not exactly sure under what leave system she was placed. (<u>Id.</u> at A-138.) According to the EEOC, Plaintiff was placed in a non-pay status as of January 26, 2005. (<u>Id.</u> at A-023.) The record

---

[8]Plaintiff had been placed in the swing room and was paid for the five days she was there. (<u>Id.</u>) No disciplinary action was taken against Plaintiff, but she was sent home after the five-day period. (<u>Id.</u> at A-136-137.)

14

reflects that Plaintiff was placed on AWOL status on February 23, 2005, when she failed to return to work after the USPS had offered her a limited duty position in early February. (Id. at A-230.)

On March 17, 2005, Plaintiff was notified by management, via certified mail, that she was on AWOL status for failure to report to duty since February 7, 2005 and for failure to provide acceptable evidence to support her continued absence. (D.I. 2, ex. A1, A-25.) A day in court was set for March 23, 2005. (Id.) During the hearing many issues were discussed in reference to Plaintiff's CA 17 and her removal. (D.I. 22, A-145.) Those in attendance were McGovern, who represented Plaintiff, Vannera, and Michaelis. (Id. at A-146.) Plaintiff provided documents showing that her physician had scheduled a functional capacity evaluation to take place on April 4, 2005, to redo the CA 17.[9] (Id. at A-026, A-146.) Plaintiff indicated that she would return to work on April 6, 2005. (Id. at A-026.) Plaintiff was informed of her options for returning to work and told she would be notified when a job became available once she resubmitted the CA 17. (Id. at A-146-147.) Plaintiff's shop steward work was not mentioned. (Id. at A-146.)

---

[9]On April 4, 2005, Plaintiff's physician agreed that she should reject the February 7, 2005 limited duty job offer. (D.I. 22, at A-024, A-144.)

Plaintiff returned to work on April 6, 2005. (D.I. 22, A-145, A-147.) On that date she provided all her updates, the high back support chair, the Family Medical and Leave Act ("FMLA") for herself and her children, CA 17 form, physician's notes and documents, and the job offer that was sent to her, but much of the paperwork was denied. (Id. at A-099, A-147-48.) According to Plaintiff, the job offer was identical to what had been offered to Plaintiff in February 2005, so she could not accept it. (Id. at A-148.) Plaintiff stated that she was removed from the building because she did not accept the job offer. (Id.) According to the EEOC, Plaintiff was placed on leave without pay status based upon her failure to provide proper medical documentation.[10] (Id. at A-026.) Plaintiff ultimately returned to work in late April and has worked consistently since that time.[11] (Id. at A-026, A-151.) Plaintiff is unaware of other individuals who were sent home for five months because of an unacceptable CA 17. (D.I. 22, A-172.) She believes it happened to her because she is a shop steward who fights for employees every day and goes against management. (Id. at A-173.) She testified that during the time she was not paid, she was affected

---

[10]As noted above, Plaintiff received retroactive workers' compensation benefits from January through May 2005. (D.I. 22, A-149-151.)

[11]Plaintiff testified that she was unsure when she returned to work and contends that management delayed her paperwork for two months. (D.I. 22, A-150, A-178.)

16

mentally by not being able to provide for her children and not knowing where money was going to come from to pay her monthly obligations. (Id. at A-165.)

Plaintiff believes that she was discriminated against based upon race because there were other white, limited duty employees, who were not treated as she was in the same situation, and were treated according to the rules, while she was not. (Id. at A-091, A-173.) Plaintiff testified that she felt "as though [she] was harassed and disparity of treatment played a large part of that and [she] was discriminated against, retaliation." (Id. at A-091.) Plaintiff believes that she was treated differently based upon her race, that she was retaliated against because of her position as a shop steward, and that she was discriminated against because of her injury. (Id. at A-092-093.) Plaintiff testified that during the relevant time period, no one made comments that the issues were connected to her race and comments dealing with the CA 17 were connected to her status as a limited duty employee. (Id. at A-195-96.) Around the time card incident, Wdzieczkowski stated on more than on occasion that Plaintiff should have known better because she is a shop steward. (Id. at A-158.) Wdzieczkowski and Michaelis indicated that they had no knowledge of Plaintiff's EEO activity, while Weissmann indicated that in the past he had attended several redress sessions with Plaintiff. (Id. at A-195-96.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).  If the moving party can demonstrate such an absence of evidence, the party opposing the motion must establish that a genuine issue as to a material fact exists and that a trial is necessary.  Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  The facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences from the evidence must be drawn in that party's favor.  Conopco, Inc. v. United States, 572 F.3d 162, 165 (3d Cir. 2009).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Rule 56 does not require a court to "scour the entire record to find a factual dispute."  Dawley v. Erie Indem. Co., 100 F. App'x 877, 881 (3d Cir. 2004) (not published). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing

of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Defendant moves for summary judgment on the grounds that: (1) Plaintiff has abandoned her gender discrimination claim; (2) the disability discrimination was filed under an incorrect statute and, in the alternative, Plaintiff is not disabled and if she is disabled, the USPS attempted to reasonably accommodate her disability; and (3) Plaintiff failed to meet her burden to show a prima facie case of racial discrimination or retaliation.  (D.I. 19.)  Plaintiff responds that she can sustain a prima facie case for all of her allegations which include disability discrimination, race discrimination, a hostile work environment, and retaliation.[12]  (D.I. 29.)

_____

[12]Plaintiff's Response to the Motion For Summary Judgment contains only one citation to the record.  (D.I. 29.)  The Court should not "be required to scour the . . . records and transcripts, without specific guidance, in order to construct specific findings of fact" to support its Memorandum and Order. See Holland v. New Jersey Dep't of Corr., 246 F.3d 267, 285 (3d Cir. 2001).  As noted by the Seventh Circuit, "Judges are not like pigs, hunting for truffles buried in' the record." Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (quoting Albrechtsen v. Board of Regents of Univ. of Wis. Sys., 309 F.3d 433, 436 (7th Cir. 2002) and United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).  In the present case, Plaintiff's Statement Of Facts falls short of establishing that a genuine issue as to a material fact exists.  See Doeblers' Pennsylvania Hybrids, 442 F.3d at 820 n.8.

## III. DISCUSSION

### A. Title VII

Title VII prohibits discriminatory employment practices based upon an individual's "race, color, religion, sex, or national origin." See 42 U.S.C. § 2000e-2(c). Plaintiff carries the initial burden of establishing a prima facie case. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under the burden shifting analysis of McDonnell-Douglas, once a plaintiff establishes a prima facie case of discrimination, the burden [shifts] to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Id. at 802. Thereafter, Plaintiff must show by a preponderance of the evidence that the legitimate, nondiscriminatory reasons Defendant offers are merely pretext for discrimination. See Jones v. School Dist. of Phil., 198 F.3d 403, 410 (3d Cir. 1999) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)). To make a successful showing of pretext, Plaintiff must present evidence that either: (1) casts sufficient doubt upon each of the legitimate reasons Defendant proffers so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause for the adverse employment action. See Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

Plaintiff's "evidentiary burden at [the prima facie] stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent - i.e., that discrimination could be a reason for the employer's action." Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir. 1996). This initial burden is not intended to be onerous. Id. Similarly, Defendant's burden is relatively light and is satisfied if Defendant articulates a legitimate reason for the adverse employment action. See e.g., Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997).

**B. Rehabilitation Act**

Plaintiff alleges that she was discriminated against on account of her partial disability. Plaintiff filed her Complaint pursuant to Title VII and, therefore, Defendant asserts that Plaintiff failed to properly state a claim since Title VII does not provide a remedy for disability discrimination. In the alternative, Defendant moves for summary judgment under the Rehabilitation Act. Inasmuch as Plaintiff proceeds pro se, and the Court liberally construes her Complaint, it will analyze the disability discrimination claim under the Rehabilitation Act.

The Rehabilitation Act prohibits discrimination against qualified individuals with disabilities. 29 U.S.C. § 794. Claims of employment discrimination in violation of the Rehabilitation Act are coextensive with standards used in the

21

Americans with Disabilities Act ("ADA") cases. Fowler v. UPMC Shadyside, 578 F.3d 203, 208 (3d Cir. 2009); see also Kurek v. North Allegheny Sch. Dist., 233 F. App'x 154, 157 n.2 (3d Cir. 2007) (not published) (citation omitted) ("[t]he Rehabilitation Act provides that the standards of the ADA are to be used in determining whether the Rehabilitation Act has been violated in the employment context.")  "To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must initially show (1) that [] she has a disability; (2) that [] she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that [] she was nonetheless terminated or otherwise prevented from performing the job." Wishkin v. Potter, 476 F.3d 180, 184-85 (3d Cir. 2007).

In order to prove that Plaintiff has a disability, she must show that she (1) has a physical or mental impairment which substantially limits one or more of her major life activities; (2) has a record of such impairment; or (3) is regarded as having such impairment. 29 U.S.C. § 705(20)(B).  "Major life activities include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working, . . . as well as sitting, standing, lifting [and] reaching." Kralik v. Durbin, 130 F.3d 76, 79 (3d Cir. 1997) (citing 29 C.F.R. §§ 1630.2(i), 1630 app.) (internal quotations

22

omitted).  Once Plaintiff establishes a prima facie case of disability discrimination, the McDonnell Douglas burden-shifting framework, as discussed above, applies.  Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007).

Defendant argues that Plaintiff is not disabled within the meaning of the Rehabilitation Act.  Plaintiff claims that her disability is carpal tunnel syndrome, with elbow surgery to alleviate pain; she is qualified to complete her job but for the disability; and she was prevented from completing her job when she was placed on AWOL status following her surgery.  (D.I. 29.)

The Court finds that no reasonable jury could conclude that Plaintiff's carpal tunnel syndrome is a disability within the meaning of the Rehabilitation Act.  The record does not indicate that Plaintiff's medical condition prevents or substantially limits any of her major life activities.  Plaintiff was able to return to work and could perform a wide range of tasks despite her carpal tunnel syndrome.  At worst, Plaintiff is limited in the amount she is able to lift, she cannot go bowling, throw a ball, or ride motorcycles.  She is, however, able to take care of herself, dress herself, eat, bathe, cook, and lift things.

Moreover, no reasonable jury could find that Plaintiff's medical condition substantially limited the major life activity of working.  She worked as a limited duty employee for numerous years, even though she could no longer perform the particular job

23

for which she was hired.  Finally, following her surgery and
recovery she was offered, and accepted, a position and continues
her employment with the USPS.  For the above reasons, the Court
finds that no reasonable jury could conclude that Plaintiff is
disabled pursuant to the Rehabilitation Act.  See, e.g.,
Marinelli v. City of Erie, Pa., 216 F.3d 354, 364-365 (3d Cir.
2000)("an individual that 'is unable to perform a particular job
for one employer, or . . . is unable to perform a specialized
job' is not substantially limited in his ability to work";
Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 644-45 (2d
Cir. 1998) (testimony suggesting that a plaintiff could only
perform light or sedentary work merely established that the
individual was disqualified from a "narrow range of jobs" and
therefore was insufficient to establish that the plaintiff was
disabled within the meaning of the ADA); McKay v. Toyota Motor
Mfg, U.S.A., Inc., 110 F.3d 369, 372-373 (6th Cir.1997)
(plaintiff's carpal tunnel syndrome, which restricted her from
performing medium to heavy work (i.e., any position requiring
"repetition motion or frequent lifting of more than ten pounds")
was insufficient to establish that the impairment disqualified
her from a broad range of jobs.)

    Finally, even had Plaintiff had established a prima facie
case and the burden shifted to Defendant to articulate a
legitimate, non-discriminatory reason for the adverse employment

24

action, no reasonable jury could find that Defendant did not have a valid, non-discriminatory basis for failing to place Plaintiff on LWOP or AWOL status. Specifically, the record reflects that Plaintiff provided unacceptable CA 17 forms, did not provide updated medical information, did not meet deadlines to provide acceptable forms, and did not timely respond to a limited duty job offer. Once Plaintiff submitted the required forms, the USPS offered her a job she was capable of performing and reasonably accommodated her.

For the above reasons, the Court will grant Defendant's Motion For Summary Judgment on the issue of disability discrimination.

## C. Race Discrimination

Plaintiff alleges that Defendant discriminated against her on the basis of race. To establish a prima facie case of employment discrimination based upon race, a plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she was subject to an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably, or the adverse job action occurred under the circumstances that give rise to an inference of discrimination. See Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003); Jones v. School Dist. of Phila., 198 F.3d at 410-11.

25

Defendant argues that Plaintiff failed to establish a prima facie case of race discrimination because Plaintiff fails to show that the USPS took an adverse employment action against her, and there is no connection between the action of which she complains and Plaintiff's race. Defendant's Motion discusses all of Plaintiff's claims of discrimination. Plaintiff, however, responds only to the claim that racial discrimination occurred when she was placed on AWOL status while recovering from surgery.[13]

"[A]n adverse employment action" under Title VII is an action by an employer that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Storey v. Burns Int'l Sec. Services, 390 F.3d 760, 764 (3d Cir. 2004) (citations omitted). "A tangible employment action [is] also defined by reference to a non-exclusive list of possible actions: 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Suders v. Easton, 325 F.3d 432, 434 (3d Cir. 2003) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)), rev'd on other grounds sub nom. Pennsylvania State Police v. Suders, 542 U.S. 129 (2004); see also Young v. Temple

---

[13]Plaintiff's other race discrimination claims are discussed under the Hostile Work Environment theory of discrimination.

Univ. Hosp., No. 08-4375, 2009 WL 5159764 (3d Cir. Dec. 31, 2009) (slip opinion).

The record reflects that Plaintiff was placed on AWOL status from February 23, 2005, when she failed to report to work until April 6, 2005. The record further reflects that Plaintiff retroactively received workers' compensation benefits for the time she was off – from January through May 2005. Plaintiff testified that her placement on AWOL status affected her mentally by not knowing how she would care for her children or pay her monthly obligations. While Plaintiff testified that she received retroactive workers' compensation benefits, she also testified that the payments were seventy-five percent of her regular rate of pay. (D.I. 22, A-164.) The record does not reflect that the AWOL status was removed from her employment record or that she was totally reimbursed for her lost wages. For these reasons, the Court finds that Plaintiff suffered an adverse employment action. See Greer v. Paulson, 505 F.3d 1306, 1317-18 (D.C. Cir. 2007) (placement of African-American employee on AWOL and LWOP were "adverse employment actions," with demonstrable effect and involving objectively tangible harm, as required for prima facie claim of race discrimination in violation of Title VII, since employee testified of serious hardship as result of AWOL status and provided other supporting evidence.)

The record, however, does not support a finding that the actions were taken against Plaintiff on the basis of race. Viewing the record as a whole, there is no evidence that the decision to place Plaintiff on AWOL status following her surgery was discriminatory. Indeed, Plaintiff's AWOL status was a result of her failure to provide acceptable CA 17 forms and updated medication information. The only support for race discrimination are Plaintiff's own conclusory allegations. Accordingly, the Court finds that Plaintiff has failed to establish a prima facie case of race discrimination.

Even assuming, arguendo, that Plaintiff has established prima facie case of race discrimination, she has failed to demonstrate that the reasons for placing Plaintiff on AWOL status were pretextual. Although an employee may be able to prove pretext by showing that the proffered reason was so arbitrary or plainly wrong that it could not have been the employer's real reason, see Jones v. School Dist. of Philadelphia, 198 F.3d at 413, Plaintiff has not done so. As discussed above, Plaintiff failed to provide acceptable CA 17 forms and failed to submit required medical documentation.

The foregoing facts would not permit a trier of fact reasonably to disbelieve Defendant's reasons for placing Plaintiff on AWOL status or conclude that some other invidious, discriminatory reason was more likely than not a motivating or

28

determinative cause of Defendant's action. Therefore, the Court
finds that Plaintiff's evidence is legally insufficient to
support a finding of race discrimination. For the above reasons,
the Court will grant Defendant's Motion For Summary Judgment on
the issue of race discrimination.

## D. Hostile Work Environment

Plaintiff claims that she was subjected to a racially
hostile work environment. She argues the behavior, such as
hiding her time card and removing her medically necessary high-
back chair, adversely changed her conditions of employment, and
caused her stress and anxiety. (D.I. 29.)

To establish a hostile work environment claim under Title
VII, Plaintiff must prove (1) she suffered intentional
discrimination because of her race; (2) the discrimination was
pervasive and regular; (3) the discrimination detrimentally
affected her; (4) the discrimination was sufficiently severe to
have detrimentally affected a reasonable person in her position;
and (5) there is a basis for vicarious liability. Cardenas v.
Massey, 269 F.3d 251, 260 (3d Cir. 2001). "'[O]ffhanded
comments, and isolated incidents (unless extremely serious)' are
not sufficient to sustain a hostile work environment claim."
Caver v. City of Trenton, 420 F.3d 263, 262 (3d Cir. 2005)
(citations omitted). Rather, the "conduct must be extreme to

29

amount to a change in the terms and conditions of employment. . .
." Id.

Defendant argues that it is entitled to summary judgment on
the hostile work environment claim because:   (1) Plaintiff has
failed to create an inference that the conduct complained of was
a result of her race; (2) the allegations consist of isolated
incidents as a result of conflict with certain managers due to
personality differences; and (3) the conditions did not
substantively alter Plaintiff's work as a modified mail
processor.

In determining whether the conduct at issue is sufficiently
extreme, the Court considers the "totality of the circumstances."
Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.
1990).  Hence, "a discrimination analysis must concentrate not on
individual incidents, but on the overall scenario." Id. at 1484;
see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 23(1993)
("[W]hether an environment is 'hostile' or 'abusive' can be
determined only by looking at all the circumstances.").  "[T]he
advent of more sophisticated and subtle forms of discrimination
requires that [the Court] analyze the aggregate effect of all
evidence and reasonable inferences therefrom, including those
concerning incidents of facially neutral mistreatment in
evaluating a hostile work environment claim." See Cardenas, 269
F.3d at 261-62; Hurley v. Atlantic City Police Dep't, 174 F.3d

95, 110-11 (3d Cir. 1999). The Court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

The Court first notes that no racist comment, written or spoken, was ever directed towards Plaintiff. Plaintiff's claim, however, is not based upon on comments, but rather upon the conduct towards her, particularly the vacation leave request incident, the time card incident, the request for updated medical information in July 2004, the holiday early start time, the sandal reprimand, the medical chair incident, and the new start time in January 2004. Even when looking at the totality of the circumstances, the acts of which Plaintiff complains do not support a claim of a hostile work environment discrimination.

Based upon statistical data, Plaintiff was treated the same as individuals who are not African-American. The totality of the circumstances indicate that Plaintiff was required to abide by USPS work rules. When she did not, conflict occurred; once she complied, the actions taken against Plaintiff were remedied. Moreover, the Court finds that the various incidents, while perhaps upsetting, occurred in isolated incidents, thus failing to be pervasive, and were not so objectively severe to change the terms and conditions of Plaintiff's employment.

For the above reasons, the Court will grant Defendant's Motion For Summary Judgment on the hostile work environment issue.

**E. Retaliation**

Plaintiff argues that she was a victim of retaliation as a result of her protected union activity as a shop steward, including placing her on AWOL status during her recovery from a work related injury. To establish a prima facie claim of retaliation, Plaintiff must prove that: (1) she engaged in protected conduct; (2) her employer took an adverse employment action against her; and (3) a causal link exists between her protected conduct and the adverse employment action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006). An "adverse employment action" under Title VII is an action by an employer that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Cardenas v. Massey, 269 F.3d at 263 (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). "A tangible employment action [is] also defined by reference to a non-exclusive list of possible actions: hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Suders v. Easton, 325 F.3d 432, 434 (3d Cir.2003) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S.

742, 761 (1998)), rev'd on other grounds sub non. Pennsylvania State Police v. Suders, 542 U.S. 129 (2004). An employer may not take adverse employment actions against an employee because she engages in activity protected under the Act, such as the filing of discrimination complaints with the EEOC. 34 C.F.R. § 100.7(e); Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 266 n.5 (3d Cir. 2007).

If an employee establishes a prima facie case . . . the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. . . . If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997) (citations and quotations omitted).

Defendant argues that it is entitled to summary judgment on Plaintiff's race and union retaliation claims on the grounds that: (1) the evidence of record does not support an inference that the alleged conduct stemmed from unlawful race discrimination, and (2) there is no evidence of a casual connection between Plaintiff's protected union activity and the adverse action taken by the USPS. For purposes of this Motion, Defendant assumes that Plaintiff, in her capacity as a union shop

steward, engaged in some EEO activity during the time period
relevant to the Complaint. (D.I. 19, n.21.) Accordingly,
Plaintiff satisfies the first element of a prima facie case of
retaliation.

Assuming, arguendo, that Plaintiff has set forth sufficient
proof to satisfy the first two elements of a retaliation claim,
it, nonetheless, fails because she has made no showing that there
was a causal connection between her participation in a protected
activity and the adverse employment action. A plaintiff may
establish the requisite causal nexus by demonstrating either "(1)
an unusually suggestive temporal proximity between the protected
activity and the allegedly retaliatory action, or (2) a pattern
of antagonism coupled with timing." Lauren W. ex rel. Jean W. v.
DeFlaminis, 480 F.3d at 267. A span of mere months, let alone
years, between the protected activity and the adverse action is
insufficient to raise an inference of causation. See LeBoon v.
Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir.
2007), cert. denied, -U.S.-, 128 S.Ct. 2053 (2008) ("[A] gap of
three months between the protected activity and the adverse
action, without more, cannot create an inference of causation and
defeat summary judgment."); Andreoli v. Gates, 482 F.3d 641, 650
(3d Cir. 2007) (five-month time period, without additional
evidence, insufficient to raise inference of causation).

One of Plaintiff's supervisors provided evidence that she was unaware of Plaintiff's EEO activity. Plaintiff testified that on a few occasions in June 2004 during the "time card incident" Wdzieczkowski, who stated she was unaware of any EEO activity by Plaintiff, told Plaintiff she should have known better because of her position as a shop steward. Wdzieczkowski's statement occurred in June 2004, but there is no evidence of record that Plaintiff had engaged in protected activity during that time. While Weissman was aware of previous EEO activity by Plaintiff, it was "several years ago." (D.I. 22, A-196.) The evidence is insufficient to demonstrate a causal connection between protected activity and an adverse employment action.

Finally, even if Plaintiff had established a prima facie case of retaliation, she has failed to rebut Defendant's nonretaliatory reasons for the actions taken against her. As discussed elsewhere in this Memorandum Opinion, Defendant provided legitimate reasons for the actions it took. Also, the Court agrees that the evidence of record does not support an inference that the alleged retaliatory conduct stemmed from unlawful race discrimination. The evidence of record would not allow a reasonable factfinder to infer that discrimination was more likely than not a motivating or determining cause of Defendant's actions.

For the above reasons, the Court will grant Defendant's Motion For Summary Judgment on the retaliation issue.

## IV. CONCLUSION

Based upon the foregoing, the Court will grant Defendant's Motion For Summary Judgment. (D.I. 18.)

An appropriate Order will be entered.